IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VILLAGE PRACTICE MANAGEMENT COMPANY, LLC, | § § § § § § § | No. 232, 2024 |
| | § § | Court Below: Court of Chancery of the State of Delaware |
| Defendant Below, Appellant, | § § § | |
| v. | § § | C.A. No. 2022-0562 |
| RYAN WEST, | § § § | |
| Plaintiff Below, Appellee. | § § § § | |

Submitted: April 2, 2025
Decided:   June 16, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices; and **DANBERG**, Chief Judge,* constituting the Court *en Banc*.

Upon appeal from the Court of Chancery.  **REVERSED** and **REMANDED.**

A. Thompson Bayliss, Esquire, Eliezer Y. Feinstein, Esquire, ABRAMS & BAYLISS LLP, Wilmington, DE, *for Appellant Village Practice Management Company, LLC*.

Jamila S. Mensah, Esquire (*argued*), NORTON ROSE FULBRIGHT US LLP, Houston, TX, Peter A. Stokes, Esquire, Yvonne K. Puig, Esquire, NORTON ROSE FULBRIGHT US LLP, Austin, TX, *Of Counsel for Appellant Village Practice Management Company, LLC*.

Shaun Michael Kelly, Esquire, Jarrett W. Horowitz, Esquire, CONNOLLY GALLAGHER LLP, Wilmington, DE, *for Appellee Ryan West*.

Daniel E. Beederman, Esquire, Adam C. Maxwell, Esquire (*argued*), SCHOENBERG FINKEL BEEDERMAN BELL GLAZER LLC, Chicago, IL, *Of Counsel for Appellee Ryan West*.

---

\* Sitting by designation pursuant to Del. Const. Art. IV §§ 12 and 38 and Supreme Court Rules 2 and 4(a) to fill the quorum as required.

**VALIHURA**, Justice:

*INTRODUCTION*

Appellant and Defendant-Below Village Practice Management Company, LLC ("Village") and Appellee and Plaintiff-Below Ryan West ("West") entered into four integrated agreements: a Management Incentive Plan ("Plan"), Notices of Grant, Award Agreements, and Village's Operating Agreement ("Operating Agreement") – (collectively the "Agreement"). Village asserts that West forfeited his vested Class B Units when he joined an alleged competitor after leaving Village, his now-former employer. West sought a declaratory judgment from the Court of Chancery that Village could not declare a forfeiture of West's vested Class B Units because he claimed that the Agreement did not limit post-employment competitive activities. He then moved for judgment on the pleadings, and Village sought to stay proceedings and to compel West to submit his legal claims to Village's Compensation Committee pursuant to Section 4(d) of the Plan.

The Court of Chancery denied Village's motion to stay proceedings. It then granted West's Motion for Judgment on the Pleadings, holding that the Agreement only restricted "detrimental activity" occurring during employment. Village could not enforce a forfeiture of West's vested Class B Units because his alleged detrimental activity occurred after he voluntarily resigned and ceased to be a "Participant" within the meaning of the Agreement. The court awarded West his attorneys' fees.

Village appeals arguing that the term "Participant" in the Agreement reasonably can be read to apply to former employees who engage in a Detrimental Activity after they end their employment with Village. Village also argues that the court erred in refusing to grant

2

the stay, as well as in granting West attorneys' fees. We **REVERSE** and **REMAND** because the term "Participant" has more than one reasonable meaning. We also **REVERSE** West's fee award because West is no longer the prevailing party. Finally, we hold that the Court of Chancery properly denied the stay, and that we need not reach the remaining issues raised on appeal.

## I. RELEVANT BACKGROUND[1]

### A. The Parties

Plaintiff-Below, Ryan West, is an individual who resides in Illinois. He is a former employee of Defendant-Below Village Practice Management Co., LLC. Village is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Illinois. Village is a national healthcare provider of primary care services.

### B. Village Grants West Class B Units Under Its Management Incentive Plan

In 2019, Village hired West as Vice President of Practice for Village. West was later promoted to Senior Vice President, Practice Management.

On March 15, 2020, West was granted 10,282 Class B Units in Village. On May 28, 2020, he received an additional grant of 3,000 Class B Units. West's Class B Unit

---

[1] The facts set forth herein are taken from the Complaint and the documents referenced therein. The Plan is referenced and attached to the Complaint as Ex. 1 and the Award Agreements and Notices of Grant are referenced and attached to the Complaint as Ex. 2 and Ex. 3. App. to Opening Br. at A22 (Compl. ¶ 12) (referencing Plan); *id.* (Compl. ¶ 15) (referencing Mar. 15, 2020 Notice of Grant and Award Agreement); *id.* (Compl. ¶ 16) (referencing May 28, 2020 Notice of Grant and Award Agreement); *id.* at A41–54 (Ex. 1); *id.* at A55–69 (Ex. 2); *id.* at A70–84 (Ex. 3). The Operating Agreement is not attached as an exhibit to the Complaint.

3

awards were each issued pursuant to a Notice of Grant, were governed by the terms of the Award Agreements, and were subject to the company's Management Incentive Plan.

### C. The Relevant Agreements Comprising the Integrated Agreement

Four documents formed the contractual relationship between West and Village:   the Plan, Notices of Grant, Award Agreements and Village's Operating Agreement.  The Award Agreements contain an integration clause in Section 14(e) that integrates them with the Plan, Notice of Grants, and Operating Agreement.  The clause provides as follows:

> <u>Entire Agreement</u>.  This Agreement (including the Notice of Grant, <u>Schedule A</u> and the Investment Representation Statement), the Plan and the Operating Agreement constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all previously written or oral negotiations, commitments, representations and agreements with respect thereto.[2]

We refer to the integrated agreement comprised of the Plan, Award Agreements, Notices of Grant, and Operating Agreement as the "Agreement."

### 1.  The Plan

As the Plan states, its purpose is to encourage employee growth and success at Village and to reward outstanding service:

> The purpose of the Village Practice Management Company, LLC Management Incentive Plan is (A) to further the growth and success of Village Practice Management Company, LLC, a Delaware limited liability company, and any successor thereto (the "<u>Company</u>"), by enabling Employees (as defined below) and Consultants (as defined below) of the Company and its Affiliates to acquire Class B Units of the Company, thereby increasing their personal interest in such growth and success, and (B) to

---

[2]  *Id.* at A59 (Award Agreement § 14(e)) (underline in original).

4

provide a means of rewarding outstanding service by such persons to or for the benefit of the Company.[3]

The Plan defines several terms relevant to this dispute as follows:

- An "<u>Award</u>" "means an award of Class B Units granted under the Plan."[4]

- An "<u>Award Agreement</u>" "means the written agreement between the Company and a Participant that evidences and sets forth the terms, conditions and restrictions pertaining to an Award."[5]

- "<u>Detrimental Activity</u>" means "(i) the rendering of services for any Competitor; (ii) any attempt to directly or indirectly solicit or induce any employee or consultant of the Company and/or its Affiliates (or any person who was an employee or consultant during the six-month period preceding such solicitation or inducement) to be employed or perform services elsewhere; (iii) any attempt directly or indirectly to solicit the trade or business of any current customer of the Company and/or its Affiliates (or person that was a customer during the six-month period preceding such solicitation) for services similar to those provided by the Company or its Affiliates; and (iv) the breach of any Restrictive Covenant by such Participant, in each case as determined by the Board in its sole discretion."[6]

- "<u>Competitor</u>" means "any person that owns, manages or operates, directly or indirectly, any business that provides services directly competitive with the Company Business of the Company or any Subsidiaries thereof."[7]

- "<u>Restrictive Covenants</u>" means "any non-competition, confidentiality or non-solicitation obligation to the Company or any of its Subsidiaries, including without limitation, any such obligation given by a Participant in favor of the Company and/or any of its Subsidiaries in any non-competition, confidentiality or non-solicitation agreement, any employment agreement or severance agreement and/or in this Plan."[8]

---

[3] *Id.* at A44 (Plan § 1) (underline in original). *See also Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1060 (Del. 2023) ("[A] typical and logical purpose of an equity incentive plan is to align employee incentives with those of the company.").

[4] App. to Opening Br. at A44 (Plan § 2(b)) (underline in original).

[5] *Id.* (Plan § 2(c)) (underline in original).

[6] *Id.* at A45 (Plan § 2(n)) (underline in original).

[7] *Id.* (Plan § 2(l)) (underline in original).

[8] *Id.* at A46 (Plan § 2(y)) (underline in original).

- A "Participant" means "any Employee or Consultant designated by the Committee to participate in the plan."[9]

- An "Employee" means "any person who is employed (within the meaning of the Code and regulations and interpretive guidance issued thereunder) by the Company or any of [sic] Subsidiary and provides services to or for the benefit of the Company."[10]

- "Code" means "the Internal Revenue Code of 1986, as amended."[11]

- "Company Business" means "the business of providing various practice management and other services to assist medical practice groups in conducting the business aspects of their respective medical practices."[12]

- "Termination of Service" means "the termination of a Participant's employment with and performance of services for, the Company and/or its Subsidiaries for any reason, whether voluntary or involuntary. Unless the Committee specifies otherwise, whether before or after the Grant Date, a change in the Participant's status from an Employee to that of a Consultant shall be deemed to incur a Termination of Service. Unless the Committee specifies otherwise, whether before or after the Grant Date, a Participant employed by, or performing services for, a Subsidiary of the Company shall be deemed to incur a Termination of Service if such Subsidiary of the Company and the Participant does not immediately thereafter become an employee of, or service provider for, the Company or any other Subsidiary of the Company."[13]

Section 5(b) sets forth the terms and conditions for awards of Class B Units as follows:

Terms and Conditions. Awards of Class B Units shall be subject to the terms and conditions set forth below.

(i)     The Committee may condition the grant or vesting thereof upon the *continued service of the Participant* or provide that such Award is fully vested on the date of grant. The conditions for grant or vesting

---

[9]  *Id.* (Plan § 2(u)) (underline in original).

[10]  *Id.* at A45 (Plan § 2(p)) (underline in original).

[11]  *Id.* (Plan § 2(h)) (underline in original).

[12]  *Id.* (Plan § 2(k)) (underline in original).

[13]  *Id.* at A46 (Plan §2(bb)) (underline in original).

6

and the other provisions of Awards (including without limitation any applicable performance goals) need not be the same with respect to each Participant or with respect to multiple Awards granted to the same Participant. The Committee may at any time, in its sole discretion, accelerate or waive, in whole or in part, any of the foregoing conditions. Unless the Committee determines otherwise, the vesting of any Award shall be tolled during a Participant's leave of absence unless continued vesting is required pursuant to law. Vesting shall resume when such Participant resumes service with the Company. Whether any performance-based vesting requirement shall be adjusted to reflect a Participant's leave of absence or shall be deemed to have been met during such Participant's leave of absence shall be determined by the Committee in its sole discretion. Additionally, the Committee may adjust the vesting schedule of any Award to reflect a change in a Participant's status from a full-time Employee to a part-time Employee.

(ii)     The Committee shall specify the Distribution Threshold applicable to each Class B Unit in the applicable Award Agreement, which may be increased by the amount of capital contributions made to the Company following the date of grant. The Distribution Threshold applicable to any Class B Unit shall be no less than the amount determined by the Committee to be necessary to cause such Class B Unit to constitute a "profits interest" within the meaning of IRS Revenue Procedure 93-27 and IRS Revenue Procedure 2001-43.

(iii)    Distributions in respect of Awards of Class B Units ***shall be made to a Participant in accordance with the provisions of the Operating Agreement***.[14]

---

[14] *Id.* at A48 (Plan § 5(b)) (underline in original, emphasis added).

7

Other sections of the Plan use the term "Participant" in the context of future events. For example, Section 10 refers to "each Participant" in the context of a public offering[15] and Section 17 allows the "Participant" to name beneficiaries "during his or her lifetime."[16]

The Plan also includes Section 13 entitled, "No Evidence of Employment or Consulting Relationship," which reads as follows:

> Nothing contained in the Plan or in any Award Agreement shall confer upon any *Participant* any right with respect to the continuation of his or her employment by, or service relationship with, the Company or any Affiliate or interfere in any way with the right of the Company or any Affiliate (subject to the terms of any separate agreement to the contrary), at any time, to terminate such employment or service relationship or to increase or decrease the compensation of the *Participant* from the rate in existence at the time of the grant of an Award. For purposes of clarification, Awards granted under the Plan shall not guarantee employment for the length of all, or any portion, of the vesting schedule of the underlying Awards. [17]

---

[15] *Id.* at A52 (Plan § 10(a)). Section 10(a) reads as follows:

> In the event that the Company or an Affiliate files a registration statement under the Securities Act with respect to an underwritten public offering of any equity securities of the Company or an Affiliate (a "Public Offering"), *each Participant shall be prohibited from effecting any public sale or distribution of any equity securities of the Company or an Affiliate* (other than as part of such underwritten public offering), including, but not limited to, pursuant to Rule 144 or Rule 144A under the Securities Act, during the "lock-up" period established by the Committee, which lock-up period shall be no shorter than that required by the underwriters of such public offering.

*Id.* (underline in original, emphasis added).

[16] *Id.* at A53–54 (Plan § 17). Section 17 reads as follows:

> Each Participant under the Plan may from time to time name any beneficiary or beneficiaries (who may be named contingently or successively) by whom any right under the Plan is to be exercised in case of such Participant's death. Each designation will revoke all prior designations by the same Participant, *shall be in a form reasonably prescribed by the Committee*, and *shall be effective only when filed by the Participant in writing with the Committee during his or her lifetime.*

*Id.* (emphasis added).

[17] *Id.* at A53 (Plan § 13) (emphasis added).

Section 9 of the Plan addresses repurchase rights concerning vested Class B Units, unvested Class B Units, Participant Cooperation, and the effect of engaging in a "Detrimental Activity." It provides:

**9. <u>REPURCHASE RIGHTS</u>**

(a) <u>Vested Class B Units</u>. Unless otherwise determined by the Committee and set forth in the applicable Award Agreement, the Company (or any person designated by the Company) shall have the right, in such cases as determined by the Committee, to repurchase all or any portion of the vested Class B Units acquired by a Participant pursuant to an Award issued under this Plan (for cash, check, delivery of a note, or cancellation of purchase money indebtedness for such Class B Units) within 185 days following the later of (i) the date of such Participant's Termination of Service (whether such termination is voluntary or involuntary, with Cause or without Cause, without regard to the reason therefor, if any) and (ii) the date such Class B Units vest if such date follows a Termination of Service. Unless otherwise determined by the Committee and set forth in the applicable Award Agreement, the purchase price per unit of Class B Units shall be the (x) Fair Market Value on the date that the Company elects to repurchase such Class B Units if such Termination of Service is for any reason other than for Cause (unless the Participant engages in a Detrimental Activity) or (y) the lower of the Fair Market Value on the date that the Company elects to repurchase such Class B Units and the amount, if any, paid by the Participant to acquire such Class B Units (that is, the cash amount or the amount of any promissory note issued by the Participant to acquire the Class B Units) if such Termination of Service is by the Company for Cause *or if the Participant engages in a Detrimental Activity at any time*. ***The effective date of any repurchase under this Section 9 shall be the date on which the Company remits the payment amount to the Participant*** (or his or her legal representative, beneficiary or estate) set forth in this **Section 9** with respect to the repurchased Class B Units to the Participant (or his or her legal representative, beneficiary or estate). Any dispute about the payment amount due with respect to any Class B Units shall not affect or change the effective date of any repurchase under this **Section 9**. If no cash payment is due to the Participation or his or her legal representative, beneficiary or estate (e.g., if the Participant has issued a promissory note to acquire the Class B Units), the effective date of any repurchase under this **Section 9** shall be the date set forth in the notice from the Company to the Participant (or his or her legal representative, beneficiary or estate) regarding the Company's election to exercise its repurchase right

under this **Section 9**.  The provisions of this **Section 9(a)** shall lapse upon the closing of a Public Offering.

(b) Unvested Class B Units.  Unless otherwise determined by the Committee and set forth in the applicable Award Agreement, in the event of a Termination of Service, regardless of the reason therefore, any unvested Class B Units shall be forfeited to the Company without any further action required by any person and without payment therefor.

(c) Participant Cooperation.  In the event of the exercise by the Company and/or its designee of the repurchase right as set forth in the foregoing clause (a), and/or in the event of any forfeiture of Class B Units as set forth in this **Section 9**, the Participant and his or her successors or assigns shall (i) take all steps necessary and desirable to obtain all required third-party, governmental and regulatory consents and approvals with respect to the surrender of the Class B Units, (ii) deliver for cancellation the certificate(s) (if any) representing such Class B Units in person or by registered mail, certified first class mail or by reputable overnight courier service to the address set forth in the Company's notice to the Participant within 10 days of receipt of such notice and (iii) take all other actions necessary and desirable to facilitate consummation of the repurchase and the cancellation of the Class B Units in a timely manner.  If the Participant fails or refuses to take any action required by this **clause (c)**, the Company may note in its unit ledger and books and records the cancellation of the Participant's Class B Units which are subject to cancellation after application of this **clause (c)**.[18]

Section 8(b) of the Plan provides for forfeiture upon engagement in a Detrimental

Activity:

Commission of Detrimental Activity by Participant. Unless otherwise determined by the Committee and set forth in the applicable Award Agreement, *an Award shall terminate and be cancelled for no consideration on the date which the Participant engages in a Detrimental Activity*.[19]

Section 4(d) of the Plan addresses the Committee's role in interpreting the Plan:

Interpretation. Except as otherwise expressly provided in the Plan, the Committee shall have all powers with respect to the administration of the

---

[18]  *Id.* at A51–52 (Plan § 9) (bold and underlines in original) (bold italics added).

[19]  *Id.* at A51 (Plan § 8(b)) (underline in original) (italics added).

10

Plan, including, without limitation, full power and authority to interpret the provisions of the Plan and any Award Agreement, and to resolve all questions arising under the Plan. All decisions of the Committee shall be conclusive and binding on all persons.[20]

Following initial briefing, Village submitted a letter to the Court of Chancery arguing that supplemental briefing was warranted in light of the court's January 2022 decision in *Terrell v. Kiromic Biopharma, Inc. (Terrell I)*[21] and in light of the court having requested similar supplemental briefing in *Page v. Village Practice Management Group, LLC*.[22] Village submitted supplemental briefing on March 31, 2023, and West submitted supplemental briefing on April 21, 2023. This Court decided the appeal of *Terrell I* in *Terrell v. Kiromic Biopharma, Inc. (Terrell II)* on May 4, 2023, which prompted the parties to file additional supplemental briefing below addressing *Terrell II*. Village filed its supplemental brief on May 19, 2023, arguing that the case should be stayed pursuant to Section 4(d) of the Plan. Following West's supplemental sur-reply brief filed on June 2, 2023, the Court of Chancery denied Village's request. Village now appeals this denial.

*2. The Award Agreements*

Section 4 of the Award Agreements addresses circumstances that can result in either the forfeiture or the repurchase of a Participant's vested and unvested Class B Units.[23]

---

[20] *Id.* at A47 (Plan § 4(d)) (underline in original).

[21] 2022 WL 175858 (Del. Ch. Jan. 20, 2022), *judgment entered by Terrell v. Kiromic Biopharma, Inc.*, 2022 WL 3083229 (Del. Ch. Aug. 2, 2022), *rev'd Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610 (Del. 2023) [hereinafter *Terrell II*].

[22] 2023 WL 3563049 (Del. Ch. May 19, 2023).

[23] App. to Opening Br. at A57 (Award Agreements § 4).

11

Village argues that Section 4(a) (the "Forfeiture Clause") applies here whereas West argues that Section 4(b) applies.

Section 4(a) of the Award Agreements provides for forfeiture of vested and unvested Class B Units upon commission of a Detrimental Activity as follows:

> Termination of Service for Cause; Detrimental Activity. In the event of the Participant's Termination of Service for Cause or upon the Participant's commission of a Detrimental Activity, all the Class B Units, vested and unvested, shall immediately terminate and be forfeited without payment therefore.[24]

If West were terminated for any reason other than for Cause, his vested Class B Units would be subject to Village's right to repurchase them pursuant to Section 4(b) of the Award Agreements:

> Other Termination of Service. In the event of the Participant's Termination of Service other than for Cause, all unvested Class B Units shall immediately terminate and be forfeited without payment therefore and all vested Class B Units shall be subject to the repurchase rights of the Company or its designee as set forth in Section 9 of the Plan.[25]

The Award Agreements have cover pages which the Award Agreements define as the "Notice of Grant."[26] The Award Agreements define "Participant" as "the participant identified on the cover page (the 'Participant')[.]"[27] The "participant identified on the cover page" is listed as "Ryan West[.]" The Award Agreements also state that "[c]apitalized terms *not* defined herein shall have the meanings ascribed to such terms in

---

[24] *Id.* (Award Agreements § 4(a)) (underline in original).

[25] *Id.* (Award Agreements § 4(b)) (underline in original).

[26] *Id.* (Award Agreements, Introductory Paragraphs) (underline in original).

[27] *Id.* (underline in original).

12

the Plan or in the Notice of Grant."[28]  West points to the language "[c]apitalized terms not defined herein shall have the meanings ascribed to such terms in the Plan…" and argues that the Plan's definition of "Participant" controls and applies only to current employees.[29]  Village responds that West overlooks the phrase "not defined herein" in the Awards Agreement and points out that "Participant" is, in fact, defined in the Award Agreements as "the participant identified on the cover page."  The Notice of Grant is "attached as the cover page hereto"[30] which, in turn, states, "Participant Name:  Ryan West."[31]  Village argues that the Award Agreements' definition is not tethered to employment status.

Other sections of the Award Agreements are also relevant to the overall scheme or plan in that they seem to apply post-termination.  Examples of these sections include:

> 5.  Participant Cooperation.  In the event of the exercise by the Company and/or its designee of the repurchase right and/or in the event of any forfeiture of Class B Units, as set forth herein or in Section 9 of the Plan, the Participant shall deliver the certificate(s) (if any) representing the Class B Units and will take all other steps as provided in Section 9(c) of the Plan to facilitate the consummation or the repurchase and the cancellation of the Class B Units in a timely manner.[32]

> 7.  Operating Agreement.  The Participant acknowledges and agrees that the issuance of Class B Units hereunder require the Participant to become a party to the Operating Agreement.  The Participant further acknowledges that his or her rights as a Company equityholder will be limited by, and subject to, the terms of the Operating Agreement, including, but not limited to those terms relating to transfer restrictions and the Company's right of first refusal

---

[28]  *Id.* (emphasis added).

[29]  Answering Br. at 20.

[30]  App. to Opening Br. at A57 (Award Agreements, Introductory Paragraphs).

[31]  *Id*. at A56 (Notice of Grant).

[32]  *Id*. at A57 (Award Agreement § 5) (underline in original).

and "drag-along" rights of the Company and certain of its equityholders as set forth in the Operating Agreement.[33]

9. <u>Public Offering</u>. The Participant agrees that, in the event that the Company or an Affiliate of the Company files a registration statement under the Securities Act with respect to an underwritten public offering of any equity securities, the Participant will be subject to the "lock-up" requirements set forth [sic] <u>Section 10</u> of the Plan.[34]

Additionally, Section 14 contains a subsection on "Governing Law" that extends beyond termination,[35] as well as a subsection referencing the "Participant" being bound by the Operating Agreement without specifying any limitations based on employment status.[36]

*3. The Notices of Grant*

The Notices of Grant are attached as cover pages to the Award Agreements and contain the language "Participant Name: Ryan West" followed by what appears to be West's address.[37] The Notices of Grant refer to the other agreements that form the integrated agreement as follows:

The Class B Units are subject to the terms of the Plan and the Agreement, both of which have been provided to you. You will be required to sign a joinder to the Operating Agreement and an Investment Representation Statement and the Class B Units will also be governed by these documents.[38]

Sections in the Notices of Grant discussing the Vesting Schedule and Repurchase Right also refer to the applicability of the Plan as follows:

---

[33] *Id.* at A58 (Award Agreement § 7) (underline in original).

[34] *Id.* (Award Agreement § 9) (underlines in original).

[35] *Id.* at A59 (Award Agreement § 14(d)).

[36] *Id.* at A60 (Award Agreement § 14(h)).

[37] *Id.* at A56 (Notice of Grant).

[38] *Id.*

14

Vesting Schedule:

The Class B Units will become vested and exercisable in accordance with Schedule A hereto, subject to your continued service to or for the benefit of the Company (as an Employee or a Consultant) through the applicable vesting date. Notwithstanding the foregoing, the vesting schedule set forth on Schedule A may be modified as set forth in Section 5(b) of the Plan in the event of certain changes in your employment status (*e.g.*, a change in status from a full-time Employee to that of a part-time Employee).

Repurchase Right:

Upon your Termination of Service, regardless of the reason therefor, the Class B Units will be subject to the repurchase rights set forth in Section 9 of the Plan. [39]

*4. The Operating Agreement*

Among the provisions in the Operating Agreement are those restricting transfer, creating a right of first offer, and "drag-along" rights – none of which explicitly restrict their application to individuals presently employed by Village.[40] These provisions are explicitly referenced in the Award Agreements.[41] The Operating Agreement has a definitions section, but the section does not define "Participant" or "Employee."[42]

*C. Events Leading to This Litigation*

West provided notice of his resignation to Village on or about May 7, 2021. He and Village mutually agreed that West's employment with Village terminated effective on June 1, 2021. West was not terminated for Cause. Rather, he voluntarily resigned his

---

[39] *Id.* (underlines in original).

[40] *Id.* at A246–47 (Operating Agreement § 8.3) (Transfers); *id.* at A248–49 (Operating Agreement § 8.4) (Drag-Along Rights); *id.* at A249–50 (Operating Agreement § 8.5) (Right of First Offer).

[41] *Id.* at A58 (Award Agreement § 7).

[42] *Id.* at A193–209 (Operating Agreement Defined Terms).

employment. Pursuant to West's Class B Units Award Agreement, West was vested in 3,748.91667 Class B Units at the time of his Termination of Service. Thereafter, he left Village and began work for another entity which Village contended was a Competitor, namely, Midwest Physician Administrative Services, LLC, d/b/a Duly Health and Care.

Village asserted that West forfeited his vested Class B Units when he became an employee of Duly Health. West then filed the seven-count Complaint in the Court of Chancery.

### D. Proceedings in the Court of Chancery

The procedural history is convoluted given the issuance of several relevant decisions by the Court of Chancery and this Court during the briefing on West's motion for judgment on the pleadings.

### 1. West's Complaint

In Count I, entitled Declaratory Judgment Pursuant to 10 *Del. C.* § 6501 *et seq.* — Construction of Plain Language of Equity Documents, West alleged that, based on the plain language of the Agreement, the Forfeiture Clause is temporally limited by the definition of Detrimental Activity to the duration of employment, and does not extend beyond a Participant's employment. West sought a declaration from the court that his vested Class B Units had not been forfeited.

In Count II, West alleged that because the Forfeiture Clause is without any temporal or geographical limitation, it is an unlawful restraint of trade and is, therefore,

16

unenforceable as a matter of law. His five remaining counts were alleged in the alternative and are not the focus of this appeal.[43]

### 2. West Moves for Judgment on the Pleadings

#### a. Initial Briefing on the Motion

On October 14, 2022, West filed his opening brief in support of his motion for judgment on the pleadings.[44] He argued that Village could not declare a forfeiture of his vested Class B Units. This is because "Section 4(a) applies—by its plain language—only to a 'Participant[,]'"[45] "[a] 'Participant' is defined as 'any Employee or Consultant designated by the Committee to participate in the Plan[,]' and, in turn, 'Employee' is defined as 'any person who is *employed*…by the Company or any Subsidiary and *provides* services to or for the benefit of the Company.'"[46] According to West, Delaware courts consider verb tense when interpreting contract provisions and forfeiture of vested Class B Units occurs only when a Participant— by definition, a current Employee—engages in the following two limited scenarios: 1) being terminated for Cause; or 2) engaging in a Detrimental Activity. Thus, West concluded that he was not a Participant (or Employee of

---

[43] *Id.* at A28–38 (Compl. ¶¶ 53–111). These counts are: Count III (In the Alternative — Declaratory Judgment Pursuant to 10 *Del. C.* § 6501 *et seq.* — Unenforceability of Forfeiture Clause as a Restraint of Trade Not Narrowly Tailored to Protect a Legitimate Business Interest), Count IV (In the Alternative — Breach of Contract), Count V (In the Alternative — Breach of the Implied Covenant of Good Faith and Fair Dealing), Count VI (In the Alternative —Violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.*), and Count VII (In the Alternative — Promissory Estoppel).

[44] *Id.* at A123–45 (Opening Brief in Support of Plaintiff's Motion for Judgment on the Pleadings [hereinafter: Pleadings Opening Br.]).

[45] *Id.* at A136 (Pleadings Opening Br. at 9).

[46] *Id.* (emphasis added in Pleadings Opening Br.).

Village) when he allegedly engaged in a Detrimental Activity by joining Duly Health and thus, he did not forfeit his vested Class B Units as a matter of law.

Next, West argued that the definition of Detrimental Activity is unreasonable and unenforceable as a matter of law because it contains no temporal limitation, no geographical limitation, and does not otherwise protect a legitimate interest of Village. He urged the Court not to rewrite the definition of Detrimental Activity.

Village responded that the motion should be denied because there were material issues of fact. It argued that West, as a Participant, remains legally bound by all terms and conditions of the Plan Documents, including the Detrimental Activity provisions, and that an individual's status as a Participant is tied to his or her possession of equity in Village rather than to his or her employment status.

In the alternative, Village argued that the Court should deny West's motion because the term "Participant" is susceptible to more than one reasonable interpretation, and because the parties had not yet had an opportunity to present evidence on the use of the term "Participant."

Finally, Village argued that the Court of Chancery needed more information before it could determine whether the Detrimental Activity provision is an enforceable "forfeiture-for-competition" clause, and that West's breach of contract claim was without merit.

   b. *Supplemental Briefing Following New Decisions in Terrell I & II*

Two days after the briefing on the motion concluded, Village submitted a letter to the Court of Chancery requesting supplemental briefing in light of the court's request for

supplemental briefing in *Page v. Village Practice Management Group, LLC*[47] and the court's January 2022 decision in *Terrell v. Kiromic Biopharma, Inc. ("Terrell I")*.[48] On March 31, 2023, Village filed supplemental briefing pointing to Section 4(d) of the Plan arguing that the Plan unequivocally requires submission of West's dispute to the Committee. On May 4, 2023, this Court decided the appeal of *Terrell I* in *Terrell v. Kiromic Biopharma, Inc. ("Terrell II")*.[49] The parties stipulated to additional supplemental briefing following *Terrell II* and submitted briefs within the following month. We provide a brief discussion of *Terrell I & II*, followed by a discussion of the parties supplemental briefing regarding Section 4(d) below as these developments relate to Village's motion to stay these proceedings.

In *Terrell*, the dispute concerned the interpretation of a stock option agreement between Dr. Jason Terrell and Kiromic Biopharma, Inc.[50] Terrell argued that a later stock option grant (Agreement 3) did not extinguish his earlier options in Agreements 1 and 2. In *Terrell I*, the Court of Chancery examined whether a dispute resolution provision in the stock option agreement required the parties to submit their dispute to a committee of the

---

[47] 2023 WL 3563049 (Del. Ch. May 19, 2023).

[48] *Terrell v. Kiromic Biopharma, Inc.*, 2022 WL 175858 (Del. Ch. Jan. 20, 2022) [hereinafter *Terrell I*], *judgment entered by Terrell v. Kiromic Biopharma, Inc.*, 2022 WL 3083229 (Del. Ch. Aug. 2, 2022), *rev'd Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610 (Del. 2023) [hereinafter *Terrell II*].

[49] *Terrell II*, 297 A.3d at 614.

[50] *See Terrell I*, 2022 WL 175858 (Del. Ch. Jan. 20, 2022), *judgment entered by Terrell v. Kiromic Biopharma, Inc.*, 2022 WL 3083229 (Del. Ch. Aug. 2, 2022), *rev'd Terrell II*, 297 A.3d at 614; *see also Terrell v Kiromic Biopharma, Inc.*, 2024 WL 370040 (Del. Ch. Jan. 31, 2024); *Terrell v. Kiromic Biopharma, Inc.*, _A.3d_, 2025 WL 249073 (Del. Jan. 1, 2025).

company's board.[51]  After determining that the provision was not an arbitration provision, the court found that the plain text of the provision assigned the committee the authority to determine its scope.  The provision stated that disputes regarding the stock option agreement's interpretation should be submitted to a board committee.  Therefore, the committee was responsible for deciding whether the provision applied to the dispute over the Release in the Grant Notice.  The court stayed the matter pending the committee's decision.

Following the committee's interpretation of the provision, the court dismissed the action for lack of subject matter jurisdiction in an order on August 2, 2022.[52]  In doing so, the court read the applicable provision as precluding any judicial review of the committee's decision.[53]  On appeal in *Terrell II*, this Court held that the Court of Chancery correctly stayed the action initially, but had erred in dismissing the case without reviewing the committee's interpretation.[54]  This Court reversed the dismissal and remanded the case.

In its March 31, 2023 supplemental brief, Village compared the language of Section 4(d) of the Plan with the operative language in *Terrell* and argued that Section 4(d) barred West's claims.  In the alternative, Village argued that West's claims were not ripe.

---

[51]  *Terrell I*, 2022 WL 175858, at *1.

[52]  *Terrell*, 2022 WL 3083229 (order dismissing the case for lack of subject matter jurisdiction).

[53]  *Id.* at *1.  The provision that the court relied on in *Terrell I* stated that "[t]he resolution of such a dispute by the Committee shall be final and binding on the Company and Optionee."  *Terrell I*, 2022 WL 175858, at *2.

[54]  *Terrell II*, 297 A.3d at 624 (reversing and remanding for further proceedings).

West disputed Village's interpretation of Section 4(d) in a supplemental brief filed on April 21, 2023. He argued, among other points, that Section 4(d) is a limited delegation of authority and that none of the relief that he sought fell within the scope of authority delegated to the Committee. He argued that he was seeking to enforce – not interpret – the agreement, that he had a contractual right to have his claims heard and determined by the court, and that the Committee did not have the authority to determine enforceability and could not interpret unenforceable provisions in any event.

This Court issued its decision in *Terrell II* on May 4, 2023 and Village filed a supplemental brief below on May 19, 2023 arguing that a stay of the present case was still required. West continued to oppose a stay arguing that a stay was not warranted because the Committee had already interpreted the Plan and the matter was ripe for judicial review.

*3. The Court of Chancery Addresses Section 4(d) in the Page Case*

The same day that Village filed its supplemental brief addressing this Court's *Terrell II* decision, the Court of Chancery stayed an action against Village by another former employee, Erin Page.[55] The Court of Chancery in *Page* interpreted the same Section 4(d) clause under the Plan and held, with respect to Page, that Section 4(d) entitled Village's Committee to first interpret the provisions of the agreement. This led the Court of Chancery in *Page* to hold that:

> Having come to the same conclusion in *Terrell II*, the Delaware Supreme Court instructed that this Court must retain subject matter jurisdiction and stay the matter until the Committee "interpret[s] the provisions of the Plan and any Award Agreement, and to resolve all questions arising under the

---

[55] *Page v. Vill. Practice Mgmt. Grp., LLC*, 2023 WL 3563049 (Del. Ch. May 19, 2023).

21

Plan" raised by the plaintiff's complaint. This Court must then afford an opportunity for review of the Committee's legal determinations.[56]

### 4. The Court of Chancery Denies Village's Stay Motion in This Case

Thereafter, on August 24, 2023, the Court of Chancery issued an opinion denying Village's request to stay this matter based on Section 4(d).[57] The court observed that an order compelling an expert determination is an order compelling specific performance and that Village bore the burden of clearly and convincingly showing that the Agreement creates such a duty.[58] The court contrasted Section 4(d) with the provision in *Terrell* and explained that "[n]othing in Section 4(d) expressly indicates that the Committee's 'powers with respect to the administration of the plan' should be broadly construed to include the authority to resolve legal disputes."[59] Additionally, the court observed that other provisions of the Agreement revealed that the parties acknowledged the possibility of litigation about the Plan in court.

### 5. The Court of Chancery Grants Judgment on the Pleadings in This Case

The Court of Chancery then heard oral arguments on December 5, 2023 and subsequently rendered its bench ruling at issue here.[60] The court focused on the meaning of "Participant," stating that:

---

[56] *Page*, 2023 WL 3563049, at *2.

[57] *West v. Vill. Practice Mgmt. Co., LLC*, 2023 WL 5447378, at *1 (Del. Ch. Aug. 24, 2023).

[58] *Id.* (quoting *Pettinaro Const. Co. v. Harry C. Partridge, Jr., & Sons, Inc.*, 408 A.2d 957, 962 (Del. Ch. 1979)).

[59] *Id.* at *2.

[60] *West v. Vill. Practice Mgmt. Co., LLC*, C.A. No. 2022-0562-MTZ (Del. Ch. Dec. 5, 2023) (TRANSCRIPT) (Ex. B. to Opening Br.).

22

This dispute hinges on the meaning of one word: – "participant" – and whether it includes former employees and consultants. If "participant" only pertains to current employees or consultants, [Village] did not have a contractual right to cancel West's vested Class B units. This is a question of contractual interpretation and it is a legal inquiry. My analysis begins and ends with the meaning of this word.[61]

The court noted that when a contract is clear and unambiguous, the court "will give effect to the plain meaning."[62] The court emphasized that it would pay particular attention to defined terms as well as grammar and punctuation.

The court determined that the definition of "Participant" and its interplay with the consequences for engaging in determinantal activity are unambiguous. It observed that "[t]he terms 'Participant,' 'Termination of Service,' 'Cause,' and 'Detrimental Activity" are all defined terms[]" and that "[t]he definitions are found in the Management Incentive Plan, per the [Award Agreement]'s merger clause at Section 14(e)."[63] The court noted that "Section 2(u) of the Plan defines 'Participant' to mean 'any Employee or Consultant designated by the Committee to participate in the Plan.'"[64]

The court stated that "[t]he verb tense for being an 'employee' and 'consultant,' the two terms comprising 'participant,' is the present tense. Neither term provides for past tense, or former, employees or consultants."[65] This observation led the court to conclude that "[t]he grammatical structure limits these definitions to current consultants or

---

[61] *Id.* at 44:22–45:6.

[62] *Id.* at 46:4–5.

[63] *Id.* at 48:11–15.

[64] *Id.* at 48:16–19.

[65] *Id.* at 49:7–11.

employees of [Village]."[66] The court then stated that "[o]nly 'Participants' are subject to forfeiture for 'Detrimental Activity' – that is, only current employees and consultants. The express use of the defined term 'Participant' in this clause cabins the consequences of 'Detrimental Activity' to current employees and consultants."[67] Substituting the defined terms into Section 4(a), the court concluded that nothing in Sections 2(n), 8(b), or 4(a) imposes post-separation prohibitions or consequences for engaging in Detrimental Activity on any Participant.

The court rejected Village's argument that the meaning of "Participant" in the Agreement imposes other post-termination obligations on the Participant, like cooperating with the repurchase or cancellation of forfeited units. Instead, the court determined that "the language of those obligations, with clear future mandatory language extending the obligations beyond the period of participant status, supports interpreting the word 'Participant' as defined to current employees and contractors."[68] As an example, the court noted that "Section 5 clearly spells out future and mandatory obligations that a participant agrees to at the time he signs the [Award Agreement]: additional language of 'shall deliver' and 'will take' is necessary to describe those post-termination obligations."[69] By contrast,

---

[66] *Id.* at 49:4–6. In reaching its conclusion based on grammatical structure, the court cited *Doe v. Cedars Acad., LLC*, 2010 WL 5825343, at *6 n.64 (Del. Super. Oct. 27, 2010), which quotes 11 *Williston on Contracts*, Section 32.9. *Id.* at 49:6–7.

[67] *Id.* at 49:22–50:4.

[68] *Id.* at 50:17–21.

[69] *Id.* at 50:22–51:2. The court noted that it "d[id] not understand West to be making the argument that he has no other obligations under the Equity Agreements where their plain language imposes them after termination." *Id.* at 47:20–23.

the court observed that "Section 4(a) has no such language addressing future detrimental activity, or imposing any obligation on a participant not to commit detrimental activity in the future."[70]

Additionally, the court stated that "[i]f [it] were to evaluate the forfeitures for reasonableness as restrictive covenants, they would be unreasonable if 'Participant' included former employees."[71] But it noted that it would "not go so far today," pointing to the then-pending appeal of *Ainslie v. Cantor Fitzgerald*.[72]

After concluding that Section 8(b) of the Plan and 4(a) of the Award Agreements apply only to current employees and consultants – and, therefore, do not apply to West after his resignation – the court held that Village could not declare a forfeiture of the vested Class B Units for engaging in a "Detrimental Activity." Accordingly, the court granted West's motion for judgment on the pleadings as to Count I and held that the remaining counts were moot.

On May 13, 2024, the Court of Chancery granted West's Motion for Attorneys' Fees and Expenses.

---

[70] *Id.* at 51:3–6. On appeal, West has not similarly emphasized that Sections 5 and 9 are distinguishable by being qualified by future tense language.

[71] *Id.* at 52:17–20.

[72] *Id.* at 52:20–53:1 (referencing *Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924 (Del. Ch. Jan. 4, 2023), *rev'd*, 312 A.3d 674 (Del. 2024)). The court noted the "[i]f [it] were going to go there, and evaluate the forfeiture as a noncompete, [it] would first note that no restrictive covenant after termination has been positively articulated, as noncompetes must be." *Id.* at 53:1–5. The court observed further that it "would also hold that if the consequences of engaging in 'Detrimental Activity' were not limited to participants, its scope would be unreasonable under Delaware law." *Id.* at 53:6–9.

## II. CONTENTIONS ON APPEAL

Village presents four main arguments on appeal. *First*, Village argues that the Court of Chancery erroneously found that West was not subject to the Forfeiture Clause because he was a former employee. Village contends that the Agreement is replete with references making clear that "Participant" status and the associated contractual obligations apply to former employees meaning that West's Class B Units could be forfeited or repurchased at a potentially lower price if West engaged in Detrimental Activity at any time. Village argues that its interpretation is at least reasonable which would preclude judgment on the pleadings.

*Second*, Village argues that the Forfeiture Clause should be analyzed under contract principles rather than as a noncompete provision. It points to our decision in *Cantor Fitzgerald, L.P. v. Ainslie*[73] and asserts that the LLC Act contains similar provisions endorsing the freedom of contract and allowing forfeiture of membership interests.

*Third*, Village argues that the Court of Chancery erroneously denied its request for a stay. It disputes the court's finding that Section 4(d) is not a dispute resolution provision like that in *Terrell*, argues that the court's denial of the stay here cannot be reconciled with the court's granting of a stay in *Page*, and argues that the court should have allowed the Committee to resolve the questions raised by West under the Plan.

*Fourth*, Village argues that the court erroneously granted West's motion for attorneys' fees.

---

[73] 312 A.3d 674 (Del. 2024).

West argues that the Court of Chancery correctly determined that "Participant" does not include former employees and that no reasonable person construing the Agreement as a whole would understand that West agreed to forfeit vested Class B Units after his employment with Village ended. West asserts that the Plan defines "Employee" in the present tense and that Village is incorrect to construe it as including former employees.

Next, West argues that the Agreement does not provide for forfeiture of vested Class B Units by a former employee who joins a competitor and that *Ainslie* does not change this result. West distinguishes *Ainslie* arguing that the *Ainslie* provisions plainly and expressly applied to post-employment competition whereas the Agreement here never mentions post-employment competition. West further argues that the court did not construe the Forfeiture Clause for reasonableness.

As for the court's denial of the stay, West maintains that the Plan did not require disputes to be submitted to the Committee.

Finally, West argues that the court properly awarded West attorneys' fees and expenses.

On March 10, 2025, parties submitted supplemental briefing addressing yet another recent decision by this Court in *LKQ Corp. v. Rutledge*.[74] Village argues that *LKQ* supports enforcement of the forfeiture provisions as written, and that, at the very least, Village's interpretation is reasonable, thus, precluding a judgment on the pleadings.

---

[74] _ A.3d_, 2024 WL 5152746 (Del. Dec. 18, 2024).

West argues that this case does not directly involve a challenge to the enforceability of the provision. Further, unlike in *LKQ*, the decision below turned on the scope of the Forfeiture Clause regarding post-employment activities, not on the enforceability of the provision. As explained below, we do not reach this issue.

### III. STANDARD OF REVIEW

"Our standard of review of the grant of a motion for judgment on the pleadings 'is to determine whether the court committed legal error in formulating or applying legal precepts.'"[75] "Accordingly, we review the grant of a motion for judgment on the pleadings *de novo*."[76]

In determining a motion for judgment on the pleadings, "[t]he court must take the well-pleaded facts alleged in the complaint as admitted."[77] "[E]xhibits attached to the pleadings or incorporated by reference may be considered."[78] "A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[79] "Either judgment on the pleadings or summary judgment is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[80] Judgment on the pleadings is improper when

---

[75] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1043 (Del. 2023) (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1204 (Del. 1993)).

[76] *Id.*

[77] *Desert Equities*, 624 A.2d at 1205.

[78] *Patheon Biologics LLC v. Humanigen, Inc.*, 2023 WL 5041233, at *1 (Del. Super. July 31, 2023).

[79] *Desert Equities*, 624 A.2d at 1205.

[80] *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005).

contractual provisions "have multiple reasonable interpretations"[81] because "[a]t the pleadings stage of a contract dispute, the Court 'cannot choose between two differing reasonable interpretations of ambiguous' contract language."[82]   Issues of interpreting contractual language "are questions of law that this Court reviews *de novo* for legal error."[83]

## IV.  ANALYSIS

A. *The Court of Chancery Erred in Granting West's Motion for Judgment on the Pleadings*

1.  *Relevant Principles of Contract Law*

"'Delaware is a contractarian state that holds parties' freedom of contract in high regard.'"[84]   "'Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party.'"[85]

This Court has explained the importance of determining what a reasonable person in the position of the parties would have thought the language of a contract means:

The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it

---

[81] *Ford Motor Co. v. Earthbound LLC*, 2024 WL 3067114, at *13 (Del. Super. June 20, 2024).

[82] *Id.* at *9 (quoting *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

[83] *Honeywell Int'l Inc. v. Air Prods. & Chems., Inc.*, 872 A.2d 944, 950 (Del. 2005).

[84] *Thompson Street Capital P'rs IV, L.P. v. Sonova United States Hearing Instruments, LLC*, _ A.3d _, 2025 WL 1213667, at *8 (Del. Apr. 28, 2025) (quoting *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 487 (Del. 2024)).

[85] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

29

meant. If a contract is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent. Stated differently, clear and unambiguous language is reasonably susceptible of *only one* interpretation. Language from a contract need not be perfectly clear for an interpretation of it to be deemed as the only reasonable one.

An interpretation that conflicts with the plain language of a contract is not reasonable, but an interpretation can be at once both reasonable, though problematic. Accordingly, although the more natural reading is a factor to be considered, it does not conclude the analysis. Even a less natural reading of a contract term may be reasonable for purposes of an ambiguity inquiry.[86]

"A provision in a contract is ambiguous when the provision in controversy is reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Where no ambiguity exists, the contract will be interpreted according to the 'ordinary and usual meaning' of its terms."[87] "'The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous.'"[88]

"We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."[89] "When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement."[90] "'[I]n giving sensible life to a real-world contract, courts must read

[86] *BitGo Holdings, Inc. v. Galaxy Digital Holdings, Ltd.*, 319 A.3d 310, 322–23 (Del. 2024) (internal quotations omitted) (emphasis in original).

[87] *Thompson*, 2025 WL 1213667, at *8 (internal quotations omitted).

[88] *Id.* (quoting *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021)).

[89] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).

[90] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

the specific provisions of the contract in light of the entire contract.'"[91]  "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[92]

## 2. *The Court Erred in Determining That There Was Only One Reasonable Meaning of "Participant"*

A key focus of the parties' dispute is whether the term "Participant" in Section 4(a) of the Award Agreements – the Forfeiture Provision – applies to West, who allegedly engaged in a Detrimental Activity after leaving his employment at Village.  Village argues that "Participant" applies to former employees, that West engaged in "Detrimental Activity," and that West's unvested *and* vested Class B Units have been forfeited because Section 4(a) provides that "upon the *Participant's* commission of a Detrimental Activity, all the Class B Units, vested and unvested, shall immediately terminate and be forfeited without payment therefore."[93]  West disagrees that "Participant" includes former employees.  He contends that Section 4(b) applies, not Section 4(a), and that because Section 4(b) applies, his vested Class B Units are subject to repurchase rather than forfeiture.

---

[91] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) (quoting *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913–14 (Del. 2017)).

[92] *GMG Cap. Invs., LLC*, 36 A.3d at 779, *quoted in Weinberg*, 294 A.3d at 1060 n.106.

[93] App. to Opening Br. at A57 (Award Agreement § 4(a)) (emphasis added).

When agreements contain an integration clause, they "should be read together as a unitary contractual scheme."[94] Accordingly, we read the Award Agreements together with the Plan, Notices of Grant, and Operating Agreement as a unitary contractual scheme.

We first look to how the parties defined "Participant" in the Agreement, then we consider other relevant provisions of the Agreement and how principles of contract construction apply to the case.

### a. The Definitions in the Agreement Do Not Unambiguously Resolve Whether "Participant" Includes West as a Former Employee

We read the integrated documents that comprise the Agreement together and observe two places where "Participant" is defined. *First*, "Participant" is defined in the Plan. The Plan defines "Participant" as "any *Employee* or Consultant designated by the Committee to participate in the Plan."[95] The Plan then defines "Employee" as "any person who is *employed* (within the meaning of the *Code and regulations and interpretive guidance issued thereunder*) by the Company or any of Subsidiary and provides services to or for the benefit of the Company."[96] And the Plan defines the "Code" as "the Internal Revenue Code of 1986, as amended."[97]

---

[94] *Thompson Street Capital P'rs IV, L.P. v. Sonova United States Hearing Instruments, LLC*, _ A.3d _, 2025 WL 1213667, at *9 (Del. Apr. 28, 2025) (quoting *Fortis Advisors LLC v. Medtronic Minimed, Inc.*, 2024 WL 3580827, at *9 (Del. Ch. July 29, 2024) (internal quotation omitted)); *see also* App. to Opening Br. at A59 (Award Agreement § 14(e)).

[95] App. to Opening Br. at A46 (Plan § 2(u)) (emphasis added). No party has argued that West is a "Consultant."

[96] *Id.* at A45 (Plan § 2(p)) (emphasis added).

[97] *Id.* (Plan § 2(h)). The Operating Agreement also defines "Code" as the "the United States Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law." *Id.* at A197 (Operating Agreement Defined Terms). We note that, neither the parties, nor

*Second*, the introductory paragraphs of the Award Agreements contain a different definition of "Participant." They include a definition of "Participant" in the Notices of Grant which points to West being a "Participant." More specifically, the introductory paragraphs of the Award Agreements state that "the participant identified on the cover page" is "(the 'Participant')[,]"[98] identify the Notices of Grant as the cover pages,[99] and the Notices of Grant include the language "Participant Name: Ryan West" followed by what appears to be West's address.[100] No qualifying language appears in this capitalized definition and, therefore, there is no language that limits this definition to West's status as a current employee. Therefore, it is at least reasonable to conclude that West remained a "Participant," even as a former employee, given the absence of any limiting language.

The Award Agreements also state that "[c]apitalized terms not defined herein shall have the meanings ascribed to such terms in the Plan or in the Notice of Grant."[101] As explained immediately above, "Participant" *is* a capitalized term defined in the introductory paragraphs to the Award Agreement – *i.e.*, that West is a "Participant." However, given the Plan's separate definition of "Participant" which defines "Participant" as "any Employee…," using the present tense, the term "Participant" reasonably can be

the Court of Chancery separately addressed West's status under the Code or the Code's potential relevance.

[98] *Id.* at A57 (Award Agreement, Introductory Paragraphs) (underline in original).

[99] *Id.* ("Notice of Grant attached as the cover page hereto (the 'Notice of Grant')") (underline in original).

[100] *Id.* at A56 (Notice of Grant).

[101] *Id.* at A57 (Award Agreements, Introductory Paragraphs).

read to mean current employees, former employees or both. This observation leads us to examine other provisions in the Agreement to determine whether there is only one reasonable meaning of "Participant" as the Vice Chancellor held.

### b. Several Provisions in the Agreement Indicate that "Participant" Is Not Limited to Current Employees as the Court Held

In addition to the definitions of "Participant," other provisions identified by the parties as relevant suggest that "Participant" may have more than one reasonable meaning. We note that "[t]he meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[102] Although the Vice Chancellor's interpretation of "Participant" is reasonable, the Award Agreements, Plan, and Operating Agreement contain provisions that lead us to conclude that the Agreement reasonably can be read to mean that former employees with vested or unvested Class B Units may also be "Participants."

### i. The Award Agreements Suggest that Former Employees Can Be "Participants"

For example, Section 5 of the Award Agreements provides that the "Participant" "shall deliver the certificate(s) (if any) representing the Class B Units and will take all other steps as provided in <u>Section 9(c)</u> of the Plan to facilitate the consummation or the repurchase and the cancellation of the Class B Units in a timely manner."[103] However, Section 9(c) of the Plan provides that repurchase rights are triggered following a

---

[102] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012), *quoted in Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1060 n.106 (Del. 2023).

[103] App. to Opening Br. at A57 (Award Agreement § 5) (underline in original).

Termination of Service.[104]  Therefore, Section 5 reasonably can be read to mean that an individual may still have obligations as a Participant after ceasing to be employed by Village.

Other sections in the Award Agreements use the term "Participant" when establishing restrictions that are continuing in nature without explicitly limiting "Participant" to current employees.  For example, Section 7 notes that the "Participant" is subject to "transfer restrictions and the Company's right of first refusal and 'drag-along' rights of the Company and certain of its equityholders as set forth in the Operating Agreement."[105]  Section 9 and Section 10 also impose restrictions on "Participants" in connection with potential future public offerings without any explicit limitations regarding current employment.[106]  Likewise, Section 14(d) establishes the governing law for the Agreement and includes language that "that the Participant agrees that he or she will only commence action in the State of Delaware."[107]  This language contains no restrictions limiting its application to current employees.

---

[104]  *Id.* at A51 (Plan § 9(a)).  The relevant language of Section 9(a) states:

> The effective date of any *repurchase* under this **Section 9** shall be the date on which the Company remits the payment amount to the *Participant* (or his or her legal representative, beneficiary or estate) set forth in this **Section 9** with respect to the *repurchased* Class B Units to the *Participant* (or his or her legal representative, beneficiary or estate).

*Id.* (bold in original, italics added).

[105]  *Id.* at A58 (Award Agreement § 7).

[106]  *Id.* (Award Agreement §§ 9–10).

[107]  *Id.* at A59 (Award Agreement § 14(d)).

## ii. The Plan Suggests that Former Employees Can Be "Participants"

The Plan also contains provisions that reasonably can be read to mean that former Village employees can be "Participants." For example, Section 9(a) contains the following language in bold concerning when a "Detrimental Activity" may occur:

> Unless otherwise determined by the Committee and set forth in the applicable Award Agreement, the purchase price per unit of Class B Units shall be the (x) Fair Market Value on the date that the Company elects to repurchase such Class B Units if such Termination of Service is for any reason other than for Cause (unless the Participant engages in a Detrimental Activity) or (y) the lower of the Fair Market Value on the date that the Company elects to repurchase such Class B Units and the amount, if any, paid by the Participant to acquire such Class B Units (that is, the cash amount or the amount of any promissory note issued by the Participant to acquire the Class B Units) if such Termination of Service is by the Company for Cause or *if the Participant engages in a Detrimental Activity at any time*. The effective date of any repurchase under this **Section 9** *shall be the date on which the Company remits the payment amount to the Participant* (or his or her legal representative, beneficiary or estate) set forth in this **Section 9** with respect to the repurchased Class B Units to the Participant (or his or her legal representative, beneficiary or estate).[108]

"Participant," as used in this section, reasonably can be read to include former Village employees. *First*, the phrase "engages in Detrimental Activity *at any time*"[109] has no language qualifying it to the time of employment. This implies that it may extend beyond the time of employment.

*Second*, included within the definition of "Detrimental Activity" in the Plan is "the breach of any Restrictive Covenant by such Participant[.]"[110] The Plan defines "Restrictive

---

[108] *Id.* at A51 (Plan § 9(a)) (emphasis added in bold italics).

[109] *Id.* (emphasis added).

[110] *Id.* at A45 (Plan § 2(n)).

Covenants" as "any non-competition, confidentiality or non-solicitation obligation to the Company or any of its Subsidiaries, including without limitation, any such obligation given by a Participant in favor of the Company and/or any of its Subsidiaries in any non-competition, confidentiality or non-solicitation agreement, any employment agreement or *severance agreement* and/or in this Plan."[111] Because Detrimental Activity encompasses breach of a severance agreement, it is reasonable to conclude that a "Detrimental Activity" can occur *after* termination of employment.[112]

*Third*, the language that "[t]he effective date of any repurchase under this **Section 9** shall be the date on which the Company remits the payment amount to the Participant" contemplates the individual being a "Participant" after termination of employment. If an individual ceased to be a "Participant" following termination of employment, it would be impossible to "remit[] the payment amount to the Participant" and, therefore, because this remission is necessary to establish the "effective date of any repurchase," it would be impossible to establish an "effective date for any repurchase" under Section 9.[113]

---

[111] *Id.* at A46 (Plan § 2(y)) (emphasis added).

[112] When asked about the "Detrimental Activity at any time" language, West's counsel responded that the language is cabined by West being a current employee or consultant. Oral Argument Video at 30:30–34:22, https://courts.delaware.gov/supreme/oralarguments. We do not view this limitation as so clear, particularly given the language referencing a "severance agreement."

[113] West's counsel stated at Oral Argument that:

> You cannot send the money to a, I agree, you cannot send the money to a Participant because this provision is triggered by a termination of service. Is that inartful drafting? Perhaps. There's other typos in this provision as well where down in the Section 9 of the agreement at the penultimate sentence, I believe, it says if no cash payment is due to the capital "P" Participation, that's not a defined term, it's clearly a typo.

Oral Argument Video at 37:57–38:28, https://courts.delaware.gov/supreme/oralarguments.

Similarly, Section 17 allows the "Participant" to designate beneficiaries "during his or her lifetime."[114] It is not conditioned on employment status.

Other sections in the Plan discuss the "Participant" without regard for current employment status. Section 10(a) addresses restrictions on the "Participant" regarding an initial public offering as follows:

> In the event that the Company or an Affiliate files a registration statement under the Securities Act with respect to an underwritten public offering of any equity securities of the Company or an Affiliate (a "<u>Public Offering</u>"), each **Participant** shall be prohibited from effecting any public sale or distribution of any equity securities of the Company or an Affiliate (other than as part of such underwritten public offering), including, but not limited to, pursuant to Rule 144 or Rule 144A under the Securities Act, during the "lock-up" period established by the Committee, which lock-up period shall be no shorter than that required by the underwriters of such public offering.[115]

Nothing in this language indicates that the restrictions on the "Participant" cease following termination of employment.

Section 8(b) is entitled "Commission of Detrimental Activity by Participant" and similarly does not tether the commission of a Detrimental Activity to a Participant's employment status.[116]

Section 5(b) also suggests that "Participant" is not restricted to current employees. In Section 5(b)(i), the Plan states that "[t]he Committee may condition the grant or vesting thereof upon the *continued service of the Participant* or provide that such Award is fully

---

[114] App. to Opening Br. at A53–54 (Plan § 17).

[115] *Id.* at A52 (Plan § 10(a)) (emphasis added).

[116] *Id.* at A51 (Plan § 8(b)).

vested on the date of grant."[117]   If "Participant" is defined to only include current employees, then this language of "continued service of the Participant" would seem to be surplusage.

Finally, Section 13's use of "Participant" in a way not necessarily connected to continued employment further supports the view that the "Participant" can include former employees.  Section 13 provides that:

> Nothing contained in the Plan or in any Award Agreement shall confer upon *any Participant any right with respect to the continuation of his or her employment by, or service relationship with, the Company* or any Affiliate or interfere in any way with the right of the Company or any Affiliate (subject to the terms of any separate agreement to the contrary), at any time, to *terminate such employment or service relationship* or to increase or decrease the compensation *of the Participant* from the rate in existence at the time of the grant of an Award.  For purposes of clarification, Awards granted under the Plan shall not guarantee employment for the length of all, or any portion, of the vesting schedule of the underlying Awards.[118]

### iii.   The Operating Agreement Suggests that Former Employees Can Be "Participants"

In addition, the Operating Agreement – to which the "Participant" becomes a party – includes provisions that suggest that they continue to apply beyond termination of employment.[119]   These include provisions restricting transfer, creating a right of first refusal, and "drag-along" rights – none of which explicitly restricts their application to

---

[117]  *Id.* at A48 (Plan § 5(b)(i)).

[118]  *Id.* at A53 (Plan § 13) (emphasis added).

[119]  Section 7 of the Award Agreement states: "The Participant acknowledges and agrees that the issuance of Class B Units hereunder require the Participant to become a part to the Operating Agreement."  *Id.* at A58 (Award Agreements § 7)..

individuals presently employed by Village.[120]  These obligations are explicitly referenced in the Award Agreements and Plan.[121]  These provisions, in our view, suggest that the term "Participant" reasonably can be read to include not only current employees, but also former employees.

In sum, the term "Participant" as used in the Award Agreements, Plan, and Operating Agreement reasonably can be construed to include former employees of Village.  However, the Vice Chancellor's reading of "Participant" to include only current employees is also reasonable.  Because there is more than one reasonable reading of "Participant," West is not entitled to judgment on the pleadings in his favor.  "A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[122]  "Either judgment on the pleadings or summary judgment is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[123]  In view of the unresolved ambiguity regarding the meaning of "Participant", we **REVERSE** the grant of judgment on the pleadings in West's favor.

---

[120]  *Id.* at A246–47 (Operating Agreement § 8.3) (Transfers); *id.* at A247–49 (Operating Agreement § 8.4) (Drag-Along Rights); *id.* at A249–50 (Operating Agreement § 8.5) (Right of First Offer).

[121]  *Id.* at A58 (Award Agreements § 7); *id.* at A50 (Plan § 7(c)).

[122]  *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[123]  *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005).

*B. The Court of Chancery Did Not Undertake a Reasonableness Analysis and We Need Not Decide the Issue*

As noted above, the Court of Chancery did not engage in a reasonableness analysis. The Court of Chancery phrased its ruling in hypothetical terms and stated that, "I do not go so far today, because my opinion that forfeitures for competition should be evaluated for reasonableness as restrictive covenants, as set forth in *Ainslie v. Cantor Fitzgerald*, is currently on appeal before the Delaware Supreme Court."[124] This issue should, if necessary, be addressed by the Court of Chancery in the first instance on remand.

*C. The Court of Chancery Properly Denied the Request for a Stay*

Village argues that the Court of Chancery erroneously denied Village's request for a stay. We review the Court of Chancery's denial of a motion to stay for an abuse of discretion.[125] "To find an abuse of discretion, there must be a showing that the trial court acted in an arbitrary and capricious manner."[126]

Village points to two cases – *Terrell v. Kiromic Biopharma, Inc. (Terrell II)*[127] and *Page v. Village Practice Management Group, LLC*[128] – as supporting a stay here. For the reasons below, we find these cases distinguishable and conclude that the Court of Chancery properly denied Village's request for a stay.

---

[124] *West v. Vill. Practice Mgmt. Co., LLC*, C.A. No. 2022-0562-MTZ, at 52:20–53:1 (Del. Ch. Dec. 5, 2023) (TRANSCRIPT) (Ex. B. to Opening Br.).

[125] *Matter of Marta*, 672 A.2d 984, 987 (Del. 1996).

[126] *Spencer v. Wal-Mart Stores E., LP*, 930 A.2d 881, 887 (Del. 2007).

[127] 297 A.3d 610 (Del. 2023).

[128] 2023 WL 3563049 (Del. Ch. May 19, 2023).

### 1. Terrell and Page Required Disputes to Be Resolved by the Committee First

In *Terrell II*, we considered an alternative dispute resolution ("ADR") provision that read as follows: "Any dispute regarding the interpretation of this Agreement shall be submitted by Optionee or the Company to the Committee for review. The resolution of such a dispute by the Committee shall be final and binding on the Company and Optionee."[129]

We held although "the Court of Chancery properly stayed the action to permit the board's committee to interpret the agreement and notice in the first instance[,]" we disagreed with the court's decision to dismiss the former director's complaint without any meaningful review of the committee's interpretation.[130] We held that because the provision at issue called for an expert determination and not an arbitration, and because it required the committee to reach legal determinations as opposed to making findings of fact within its area of expertise, the Court of Chancery was not required to defer to the committee's conclusions. We remanded the matter so that the court could conduct a review of the committee's conclusions.

In *Page*, the Court of Chancery considered whether Section 4(d) of the Plan – the same provision of the Plan in dispute here – applied to a different former employee of Village, Erin Page.[131] Village had not yet decided whether Page's awards were forfeited. The court stayed the action until the committee interpreted the Plan and held that after the

---

[129] *Terrell II*, 297 A.3d at 615; *id.* at 617.

[130] *Terrell II*, 297 A.3d at 613.

[131] *Page*, 2023 WL 3563049, at *1–2. *Compare id. with* App. to Opening Br. at A47 (Plan § 4(d)).

committee's review, it "must then afford an opportunity for review of the Committee's legal determinations."[132]

### 2. *Neither Terrell nor Page Require Determination by the Committee Here*

As the Court of Chancery correctly stated, "[a]n order compelling an expert determination 'is in fact an order compelling specific performance' of an alleged duty arising from and, indeed, governed by the contractual term creating it. In requesting to compel specific performance, [Village] bears the burden of showing that the Agreement clearly and convincingly creates such a duty."[133] The court determined that Village had not satisfied its burden.

We begin by comparing the language of the *Terrell* provision with that of Section 4(d) of the Plan. The language at issue in *Terrell* was as follows:

> *Any dispute* regarding the interpretation of this Agreement *shall be submitted* by Optionee or the Company to the Committee for review. The resolution of such a *dispute* by the Committee shall be final and binding on the Company and Optionee.[134]

The language of Section 4(d) of the Plan is as follows:

> Interpretation. Except as otherwise expressly provided in the Plan, the Committee shall have all powers with respect to the administration of the Plan, including, without limitation, full power and authority to interpret the provisions of the Plan and any Award Agreement, and to resolve all questions

---

[132] *Page*, 2023 WL 3563049, at *2. The court subsequently granted a stipulation to dismiss with prejudice. *Page v. Vill. Practice Mgmt. Grp., LLC*, 2023 WL 7275813 (Del. Ch. Nov. 2, 2023) (Stipulation and (Proposed) Order of Dismissal).

[133] *West v. Vill. Practice Mgmt. Co., LLC*, 2023 WL 5447378, at *1 (Del. Ch. Aug. 24, 2023).

[134] *Terrell v. Kiromic Biopharma, Inc. ("Terrell II")*, 297 A.3d 610, 615 (Del. 2023) (emphasis added).

arising under the Plan. All decisions of the Committee shall be conclusive and binding on all persons.[135]

This comparison leads us to conclude that Section 4(d) does not require the present dispute to be resolved by the Committee because, unlike the *Terrell* provision, Section 4(d) does not clearly and convincingly remove dispute resolution from the courts. The *Terrell* provision required that "[t]he resolution of such a *dispute* by the Committee shall be final and binding on the Company and Optionee."[136] By contrast, Section 4(d) does not use the word "dispute" and instead gives the Committee powers "with respect to the administration of the Plan[.]"[137] Section 4(d) did not put West on notice that Village intended to submit all disputes to the Committee.

Other parts of the Agreement acknowledge the possibility of litigation about the Plan in court. For example, Section 14(d) of the Award Agreements expressly contemplates this possibility as follows:

> Should any provision of this Agreement be determined by a *court of law* to be illegal or unenforceable, the other provisions shall nevertheless remain effective and shall remain enforceable. Each of the parties submits to the nonexclusive jurisdiction of *any state or federal court in the State of Delaware in any action or proceeding arising out of or relating to this Agreement* and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court; provided, however, that the *Participant agrees that he or she will only commence action in the State of Delaware.*[138]

---

[135] App. to Opening Br. at A47 (Plan § 4(d)) (underline in original).

[136] *Terrell II*, 297 A.3d at 615 (emphasis added).

[137] App. to Opening Br. at A47 (Plan § 4(d)).

[138] *Id.* at A59 (Award Agreement § 14(d)) (emphasis added).

Section 14(d)'s contemplation of courts deciding disputes under the Agreement weighs against a conclusion that Section 4(d) calls for all disputes to be submitted to the Committee.

The present case is also distinguishable from *Page*. In *Page*, Village had not yet decided the issue; rather it sought to have the Committee determine it in the first instance. Further, the *Page* parties "did not have the benefit of briefing *Terrell II* due to the linear nature of time[.]"[139] Here, the parties briefed *Terrell II* and Village has already decided the issue, thus leaving no room for the Committee to decide it in the first instance, even if the court were to grant a stay.

### D. Reversal of the Rule 12(c) Motion Requires Reversal of the Fee Award

The Court of Chancery granted West the Fee Award pursuant to the Prevailing Party Provision in the Operating Agreement.[140] Because we reverse the grant of West's motion for judgment on the pleadings, West is not the prevailing party and, accordingly, cannot recover attorneys' fees under the Prevailing Party Provision. Accordingly, we reverse the Fee Award.

---

[139] *Page*, 2023 WL 3563049, at *1.

[140] Ex. D ([Proposed] Order Granting Plaintiff's Motion for Attorney's Fees and Expenses). The prevailing party provision states as follows:

> Attorneys' Fees. In any action or proceeding brought to enforce any provision of this Agreement, or where any provision hereof is validly asserted as a defense, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses from the non-prevailing party in addition to any other available remedy.

App. to Opening Br. at A271 (Operating Agreement §12.13) (underline in original).

## V. CONCLUSION

For the foregoing reasons we **REVERSE** the grant of the motion for judgment on the pleadings and **REMAND** for further proceedings consistent with this Opinion.